IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:14-CV-00024-D

| | |
|---|---|
| LISA S. WRIGHT, | ) |
| | ) |
| Plaintiff/Claimant, | ) |
| | ) |
| | ) **MEMORANDUM AND** |
| v. | ) **RECOMMENDATION** |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

This matter is before the court on the parties' cross-motions for judgment on the pleadings [DE-24, DE-37] pursuant to Fed. R. Civ. P. 12(c).[1] Claimant Lisa S. Wright ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of her application for a period of disability and Disability Insurance Benefits ("DIB"). The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be denied, Defendant's Motion for Judgment on the Pleadings be allowed, and the final decision of the Commissioner be upheld.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on July 21, 2011, alleging disability beginning September 28, 2009. (R. 11, 136-37). Her claim was denied initially and upon reconsideration. (R. 65-89). A hearing before the Administrative Law Judge ("ALJ") was

---

[1] Claimant filed a motion for judgment on the pleadings on July 23, 2014 [DE-23], then filed an amended motion that same day [DE-24] to correct the case caption.

held on October 17, 2012, at which Claimant was represented by counsel and a witness and a vocational expert ("VE") appeared and testified. (R. 26-64). On October 26, 2012, the ALJ issued a decision denying Claimant's request for benefits. (R. 8-25). Claimant then requested a review of the ALJ's decision by the Appeals Council (R. 7), and submitted additional evidence in the form of a representative brief as part of her request (R. 214-16). After reviewing and incorporating the additional evidence into the record, the Appeals Council denied Claimant's request for review on December 18, 2012. (R. 1-6). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded*

2

*by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520, under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

3

In this case, Claimant alleges that the ALJ erred (1) by failing to find that Claimant's impairments met Listings 12.03, 12.04, 12.6, and 12.08, (2) in evaluating Claimant's RFC, (3) by failing to give controlling weight to the opinion of Claimant's treating psychiatrist and failing to properly consider Claimant's Global Assessment of Functioning ("GAF") scores, and (4) by failing to consider Claimant's Disability Determination rendered by the North Carolina Department of Health and Human Services ("NC DHHS"). Pl.'s Mem. Supp. Pl.'s Mot. J. Pleadings ("Pl.'s Mem.") [DE-25] at 18-28.

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 13). Next, the ALJ determined Claimant had the following severe impairments: bipolar disorder with history of substance use, anxiety disorder, personality disorder, and ADHD by history. *Id.* The ALJ also found that Claimant had the following non-medically determinable impairments: schizophrenia, obsessive-compulsive disorder ("OCD"), and dissociative identity disorder. (R. 13-14). However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild limitations in her activities of daily living, and moderate difficulties in her social functioning and concentration, persistence and pace, with one to two episodes of decompensation. (R. 14-15).

4

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform a full range of work at all exertional levels, with the following non-exertional limitations:

she is capable of performing simple, routine, repetitive tasks, and maintaining concentration, persistence, and pace to remain on task for periods of two hours at a time throughout an eight hour work day in order to perform such tasks. She requires a low stress work setting, which is defined no [sic] production pace work, rather a goal-oriented job that primarily deals with things as opposed to people. In addition, the work setting must be stable, i.e. it must not involve more than occasional changes; no more than occasional decision making. She could have occasional interaction with supervisors or co-workers, but no more than incidental contact with the public, which means that she must not be required to work directly with the public as a component of her work, such as sales or negotiation.

(R. 15-16). In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 16-18).

At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of her past relevant work as a registered nurse. (R. 19). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 20).

## B. Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 40 years old and unemployed. (R. 31, 35). Claimant is a college graduate with a degree in nursing. (R. 31-32). Claimant completed an associate's degree in criminal justice by taking in-person classes for about a year at Pamlico Community College beginning in 2010. (R. 32-33). Claimant hoped to become a probation officer, but lost interest and has not yet received her degree due to an outstanding

5

financial issue with the school. *Id.* In the beginning of 2012, Claimant started taking online psychology courses through Argosy, and anticipates that she will finish her degree in 2015. (R. 32-34). Claimant spends an hour every day online working on her coursework, although she testified that she has lost interest in the degree but feels she has to continue because of her student loans. (R. 34).

Claimant was last employed as a registered nurse ("RN") at Pitt Memorial Hospital, and prior to that she was a travel nurse at several different hospitals. (R. 35). Travel nurses are contract positions, but otherwise the basic nursing duties (taking care of patients and charting) remain the same. (R. 35-36). Claimant's duties as RN at Pitt Memorial Hospital included giving medicine to patients, helping patients get up and move around, charting, and talking to doctors. (R. 36). Sometimes Claimant worked as a charge nurse, where she ran the floor and made sure everyone was doing their job, and she was also on the stroke team where she helped doctors in the emergency room with stroke patients. *Id.* Claimant testified that she was paid well in her job as an RN until she stopped working due to workplace conflicts that caused her to have a breakdown. (R. 36-37). Claimant took the job at Pitt Memorial because she was promised the charge nurse position, but the nurse manager wanted that position as well. (R. 37). Claimant testified that the nurse manager was out to get her, and Claimant felt like there were always video cameras in the room and people watching her. *Id.* In the month before her breakdown, Claimant was getting into arguments with the assistant nurse manager and was sent to the manager's office after making some mistakes with patients, and was more paranoid than usual. *Id.*

Claimant discussed seeing Dr. Acosta for her mental health treatment and receiving biofeedback therapy. (R. 37-38). Claimant has been diagnosed with bipolar and anxiety disorders,

6

and she testified that she did not know when they started but she has always been anxious and nervous. (R. 38). Claimant believes that she was in a manic phase while she was working, because she was not sleeping, felt like she could do anything, and was out of control. *Id.* Claimant did not have any psychiatric care or therapy prior to 2009, nor was she taking medications for mental health issues before she stopped working. (R. 39). Claimant sees a psychiatrist once a month, and sees a therapist every other week. *Id.* When Claimant stopped working in the summer of 2009, Claimant and her four children (ages 19, 12, 10, and 8) were living with her parents. (R. 39-40). Before she stopped working, Claimant relied on her mother to help with childcare. (R. 40).

Claimant testified that when she first began therapy and taking medications, her focus and concentration increased, but currently, her symptoms were getting worse. *Id.* Claimant has talked to Dr. Acosta about increasing her medicine, but they have had issues with Medicaid paying for the medications. *Id.* Claimant takes Vyvanse for attention-deficit hyperactivity disorder ("ADHD"), Invega (a schizophrenia medication) for hallucinations and hearing voices, Viibryd for bipolar disorder, Gabapentin/Neurontin for anxiety, and Nuedexta for outbursts of crying and laughing. (R. 40-41). Claimant testified that as far as delusions and hallucinations, she has always heard and seen things throughout her life. (R. 41). Claimant believes she has multiple personality issues, because a couple of times a week, including the day of the hearing, she does not feel like herself. (R. 42). Claimant does not believe that the medications are effective, because she is still depressed, cannot concentrate, cannot follow through with tasks, and she forgets things. *Id.*

Claimant testified that she completed her community college classes while going through a manic phase that lasted approximately a year. (R. 43). At that same time, she was experimenting with drugs, acting promiscuously, and was still anxious and nervous. *Id.* During that year, Claimant

7

used marijuana and tried crack cocaine one time. *Id.* Claimant testified that she last used those drugs over a year ago. (R. 43-44). In the past year, Claimant has been down more than she has experienced manic highs. (R. 43). Claimant believes that her manic phase led her to act impulsively and use drugs. (R. 44).

Claimant testified that she enjoyed her classes at the community college. *Id.* She believes her difficulties being around people prevent her from returning to work. *Id.* Claimant feels paranoid and thinks people are watching her and are out to get her, and her mind goes blank when she has to talk to someone. *Id.* Normally, she will take someone with her to the store as opposed to going by herself. *Id.* Claimant testified that she just recently started hearing voices again after it had subsided for a while, but she has not had any hallucinations recently. (R. 45). When asked for an example of her hallucinations, Claimant stated that she sees shadow people, and when she was younger, Claimant used to see objects moving that should not be moving. *Id.* Claimant has trouble focusing her attention at times, and loses her train of thought while trying to complete a task. (R. 45-46). Claimant could not provide an estimate of the longest period of time she thought she could stay focused, but stated that she has problems every day—for example, she has to read something several times to understand it. (R. 46). Claimant tries to get her children ready for school in the morning and help them with their homework in the afternoon, but she has trouble focusing and loses patience, so her mother often helps them finish. *Id.*

Claimant testified that she sleeps for most of the day. (R. 47). She gets up with her kids in the morning but goes back to bed by 12:00 p.m. for a nap. *Id.* Claimant will wake up a couple of times during the night, but is usually able to go back to sleep. *Id.* Typically, Claimant stays in her "bed clothes" (which she was wearing at the hearing) and gets dressed four times a month when she

8

goes to church. *Id.* Claimant leaves the house five or six times a month, to go to the doctor and the therapist, and showers once a week. *Id.* Claimant does not have any relationships outside of the home, and does not talk to anyone on the phone. (R. 48). Claimant testified that the only way she communicates with people is through Facebook, which she does "every once in a while," but she is on her computer daily. *Id.* Claimant goes to her grandmother's house in the morning and helps her get dressed, watches television there for a couple of hours, goes back home and gets on the computer, and then goes back to bed until her children get home from school. *Id.* Claimant testified that she gets nervous and anxious around people, and sometimes has panic attacks. *Id.* Claimant has seen Dr. Acosta since 2009, and has followed him as he has changed medical practices. (R. 48-49). Throughout the hearing, Claimant was walking back and forth. (R. 56).

## C.    Judy Stephenson's Testimony at the Administrative Hearing

Judy Stephenson ("Stephenson"), Claimant's mother, testified at the administrative hearing. (R. 50-56). Claimant lives with Stephenson, and Stephenson testified that Claimant has changed since July of 2009 and is no longer recognizable. (R. 50). Claimant used to be very outgoing, and after July of 2009 she would no longer talk on the phone with her friends, would not go outside, and would not bathe. *Id.* Stephenson testified that Claimant stays in her bedroom all day, uses the computer, reads her Bible, sleeps, does not associate with the family, and does not do any cooking. (R. 50-51). Claimant tries to take care of her kids, but like everything else, she will start something and then Stephenson has to finish the task. (R. 51). Stephenson testified that ever since Claimant moved in with her, Claimant has been in a depressive phase. *Id.* Claimant sometimes cries during the day, because she is overly sensitive around others. *Id.*

Stephenson is not sure of the source of Claimant's issues, but she testified that Claimant was

9

married to a very abusive man beginning in 2000, who is the father of Claimant's three youngest children. (R. 52). Claimant's husband was physically abusive, threatening her with a gun to her mouth, throwing her on the ground, and choking her. *Id.* The husband was never prosecuted criminally, because he threatened Claimant and her family if she ever cooperated and testified against him. (R. 53). Claimant has limited contact with him now through the court for child support purposes and sees him occasionally when he picks up their son to visit. *Id.* When asked whether she thought Claimant could return to work considering that Claimant earned a community college degree, Stephenson testified that she does not think Claimant could return to work. (R. 53-54). Stephenson believes Claimant got the community college degree "to occupy her mind" and "just to have something to do." (R. 54). Stephenson believes Claimant was in a manic phase when she was using drugs and acting promiscuously. (R. 54-55). Claimant never used drugs before or acted promiscuously when she was younger. (R. 55). Claimant has also begun smoking cigarettes. *Id.* Looking back, Stephenson believes that Claimant has had issues with moods and manic depression throughout her life, only her family did not recognize these issues when Claimant was younger. *Id.*

## D. Vocational Expert's Testimony at the Administrative Hearing

Mark Leaptrot testified as a VE at the administrative hearing. (R. 56-63). After the VE's testimony regarding Claimant's past work experience (R. 57), the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant and asked whether the individual could perform Claimant's past relevant work assuming the following:

> [t]his individual doesn't have any particular exertional limitations. However, from a mental standpoint the hypothetical individual for the first hypothetical would be capable of maintaining, performing simple, routine, competitive [sic] tasks, maintaining attention, concentration, persistence or pace to remain on task or stay on task for periods of two hours at a time throughout an eight-hour workday.

10

In order to perform such tasks, the hypothetical individual would need a low-stress work setting, which I will further define as one that's not production oriented or production in pace rather, a goal-oriented job primarily dealing in thing [sic] as opposed to people. We need a stable work setting, which I'll further define as one that doesn't involve more than occasional changes in the work setting and the work itself. As far as decision making, no more than occasional decision making is a component of the job.

To further define working with things versus people, the job should only involve no more than occasional interaction with supervisors, coworkers. With respect to members of the public, the individual could have incidental contact with members of the public throughout the workday. However, the jobs should not require any direct interaction as a component of the job such as sales or negotiation.

(R. 57-58). The VE stated that such an individual would not be able to perform Claimant's past work as an RN, but would be able to perform the positions of office helper (DOT # 239.567-010, light, unskilled, SVP-2); routing clerk (DOT # 222.687-022, light, unskilled, SVP-2); and order clerk (DOT # 209.567-014, sedentary, unskilled, SVP-2). (R. 58-59). The VE testified that his response was consistent with the Dictionary of Occupational Titles, with the exception of the mental limitations, where his response was based on his professional observation. (R. 60).

The ALJ then modified the hypothetical, asking how the individual's ability to work would be affected if she could not stay on task for two hours at a time during the course of a typical eight-hour workday. (R. 61). The VE responded that a person who could not maintain attention and concentration for two-hour blocks, four times a day would not be able to maintain gainful employment. *Id.* The ALJ then asked how many absences would be allowed in the work setting, and the VE responded that missing one to two days a month would be acceptable but more than that would be excessive. (R. 62). The VE then confirmed that if the individual could not maintain even occasional interaction with coworkers and supervisors, all work would be precluded. *Id.*

11

## V. DISCUSSION

### A. The ALJ Properly Considered the Listings

Claimant contends that the ALJ erred in finding that Claimant's impairments do not meet or medically equal Listings 12.03, 12.04, 12.06, and 12.08. Pl.'s Mem. [DE-25] at 19-23. The Commissioner contends that substantial evidence supports the ALJ's listings determination. Def.'s Mem. [DE-38] at 6-8.

To show disability under the listings, a claimant may present evidence either that the impairment meets or is "medically equivalent" to a listed impairment. *See Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir. 1986); 20 C.F.R. § 404.1526 (regulation for determining medical equivalence). "The [ALJ] . . . is responsible for deciding . . . whether a listing is met or equaled." S.S.R. 96-6p, 1996 WL 374180, at *3 (July 2, 1996). In order to determine whether a medical impairment equals a listing, the ALJ is bound to "consider all evidence in [claimant's] case record about [the] impairment(s) and its effects on [claimant] that is relevant to this finding. . . . [The ALJ] also consider[s] the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. § 404.1526(c). "For a claimant to qualify for benefits by showing that his . . . combination of impairments[] is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990), *superseded by statute on other grounds as stated in Colon v. Apfel*, 133 F. Supp. 2d 330, 338-39 (S.D.N.Y. 2001). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531 (citation omitted). "Plaintiffs bear the burden of proving their condition meets a listing

12

and, accordingly, the responsibility of producing evidence to sustain their claims." *Rowe v. Astrue*, No. 5:07-CV-478-BO, 2008 WL 4772199, at *1 (E.D.N.C. Oct. 28, 2008) (unpublished) (citing *Pass*, 65 F.3d at 1203). Thus, where a claimant "fails to articulate why her medical impairments do, in fact, meet all of the elements of a given listed impairment," she fails to meet her burden. *Id.* (citing *Sullivan*, 493 U.S. at 530).

Listing 12.03 addresses schizophrenic, paranoid, and other psychotic disorders, Listing 12.04 addresses affective disorders, Listing 12.06 addresses anxiety-related disorders, and Listing 12.08 addresses personality disorders. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (the "Listings").

Listing 12.03 is satisfied if an individual meets the A and B criteria, or if she meets the C criteria. The A criteria require medically documented persistence of delusions or hallucinations; catatonic or grossly disorganized behavior; or incoherence, loosening of associations, illogical thinking, or poverty of content of speech meeting certain requirements. Listing 12.03A. The B criteria require marked restrictions in two of the following areas: activities of daily living; social functioning; concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. Listing 12.03B. For the first three functional areas, the ratings in order of increasing level of limitation are none, mild, moderate, marked, and extreme. Listing 12.00C1-3; 20 C.F.R. § 404.1520a(c). The last functional area—repeated episodes of decompensation, each of extended duration—means three episodes within one year or an average of one every four months, each lasting at least two weeks. Listing 12.00C4. The C criteria require a medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder meeting certain requirements. Listing 12.03C.

Listing 12.04 is satisfied if an individual meets the A and B criteria, or if he meets the C

13

criteria. The A criteria require medically documented persistence of depressive syndrome, manic syndrome, or bipolar syndrome, each meeting various requirements, and the C criteria require a medically documented history of a chronic affective disorder of at least two years' duration, again meeting various requirements. Listing 12.04A, C. The paragraph B criteria are the same as discussed above. Listing 12.04B.

Listing 12.06 is satisfied if an individual meets the A and B criteria or the A and C criteria. Listing 12.06. The A criteria require, subject to additional specific requirements, medically documented findings of generalized persistent anxiety, a persistent irrational fear, recurrent severe panic attacks, recurrent obsessions or compulsions, or recurrent and intrusive recollections of a traumatic experience. Listing 12.06A. The C criteria require the complete inability to function outside the area of one's home as a result of a condition in paragraph A. Listing 12.06C. The paragraph B criteria are the same as discussed above. Listing 12.06B.

Listing 12.08 is satisfied if an individual meets the A and B criteria. Listing 12.08. The A criteria require deeply ingrained, maladaptive patterns of behavior associated with one of various other conditions. Listing 12.08A. The B criteria are the same as discussed above. Listing 12.08B.

Here, the ALJ concluded that "the severity of claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.04, 12.06, 12.08, and 12.09," finding that neither the B nor C criteria were satisfied. (R. 14). Specifically, with respect to the B criteria, the ALJ found Claimant's mental impairments have resulted in only mild restrictions in her activity of daily living, moderate difficulties in social functioning and concentration, persistence and pace, and one to two episodes of decompensation. (R. 14-15). With respect to the C criteria, the ALJ agreed with the opinions of the Department of Disability Services

14

psychiatric consultants, who "concluded that the evidence failed to establish the presence of the 'paragraph C' criteria." (R. 15).

Claimant makes no argument as to the Paragraph C criteria for any of the challenged listings. Pl.'s Mem. [DE-25] at 19-23. With respect to the Paragraph A criteria, Claimant makes only a generalized allegation for each challenged listing. For example, with respect to Listing 12.03, Claimant argues that she "has a medically documented history of auditory and visual hallucinations, illogical thinking associated with both a blunt and flat affect, and emotional withdrawal and isolation. This combination of symptoms should result in the claimant meeting and/or equaling the functional equivalent of the listing." Pl.'s Mem. [DE-25] at 20. Claimant's arguments as to the other challenged listings are similarly generalized and contain no citations to evidentiary support. *See id.* at 19-23. Where Claimant has "the burden of proving [her] condition meets a listing and, accordingly, the responsibility of producing evidence to sustain [her] claims," *Rowe*, 2008 WL 4772199, at *1 (citation omitted), Claimant has failed to meet her burden here with respect to the Paragraph A criteria.

With respect to the Paragraph B criteria, Claimant cites to a Psychiatric Review Technique completed by her treating psychiatrist, Dr. Acosta, on August 17, 2012. Pl.'s Mem. [DE-25] at 22 (citing R. 432-45). According to Claimant, Dr. Acosta's opinion memorializes that Claimant has experienced mild restriction in activities of daily living, marked difficulties in maintaining social functioning and concentration, persistence, or pace, and three periods of decompensation, each of extended duration.[2] *Id.* However, as discussed below, the ALJ properly considered Dr. Acosta's

---

[2] To the extent that Claimant is making a Paragraph C argument with respect to Listing 12.06 where she cites to the portion of Dr. Acosta's opinion that states Claimant has a complete inability to function outside her home, Pl.'s Mem. [DE-25] at 22 (citing R. 443), as the undersigned has determined that the ALJ properly afforded little weight to Dr.

15

opinion and afforded it limited weight. Claimant cites to no other evidence in support of her argument that the ALJ erred in considering the Paragraph B criteria. Accordingly, Claimant's argument with respect to the Listings is without merit.

## B. The ALJ Properly Evaluated Dr. Acosta's Opinion

Claimant contends that the ALJ erred by failing to give controlling weight to the opinion of Dr. Acosta, Claimant's treating psychiatrist. Pl.'s Mem. [DE-25] at 25-26. Additionally, Claimant argues that the ALJ erred by failing to address the significance of Claimant's Global Assessment of Functioning ("GAF") scores in the record. *Id.* at 26-27. The Commissioner argues that substantial evidence supports the ALJ's consideration of both Dr. Acosta's opinion and Claimant's GAF scores. Def.'s Mem. [DE-38] at 10-12.

### 1. Dr. Acosta's Opinion

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). More weight is generally given to opinions of treating sources, who usually are most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, than non-treating sources, such as consultative examiners. *Id.* § 404.1527(c)(2). Though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig*, 76 F.3d at 590. In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight. *Id.*; *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (stating "[t]he ALJ may choose to give less

---

Acosta's opinion, Claimant's argument is without merit.

weight to the testimony of a treating physician if there is persuasive contrary evidence"); *Mastro*, 270 F.3d at 178 (explaining "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (citation omitted).

If the ALJ determines that a treating physician's opinion should not be considered controlling, the ALJ must then analyze and weigh all the medical opinions of record, taking into account the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, (5) whether the physician is a specialist, and (6) any other relevant factors. *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citation omitted); *Ware v. Astrue*, No. 5:11-CV-446-D, 2012 WL 6645000, at *2 (E.D.N.C. Dec. 20, 2012) (unpublished) (citing 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)). The ALJ is not required, however, to discuss all of these factors. *Ware*, 2012 WL 6645000, at *2 (citing *Oldham v. Astrue*, 509 F. 3d 1254, 1258 (10th Cir. 2007); *Munson v. Astrue*, No. 5:08-CV-110-D(3), 2008 WL 5190490, at *3 (E.D.N.C. Dec. 8, 2008) (unpublished)). While an ALJ is under no obligation to accept any medical opinion, *see Wireman v. Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006) (unpublished), she must nevertheless explain the weight afforded such opinions. *See* S.S.R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996); S.S.R 96-6p, 1996 WL 374180, at *1 (July 2, 1996). An ALJ may not reject medical evidence for the wrong reason or no reason. *Wireman*, 2006 WL 2565245, at *8. Further, "[f]orm reports, in which a physician's only obligation is to check a box or fill in a blank, are entitled to little weight in the adjudicative process." *Whitehead v. Astrue*, No. 2:10-CV-35-BO, 2011 WL 2036694, at *9-10 (E.D.N.C. May 24, 2011) (unpublished) (determining that a check-box form completed by a treating physician was not entitled

17

to controlling weight where it was inconsistent with the physician's own treatment notes and gave no explanation or reasons for the findings, leaving the ALJ unable to determine whether the physician applied the relevant regulatory definitions).

The opinion at issue here is a Psychiatric Review Technique ("PRT") completed by Dr. Acosta on August 17, 2012. (R. 432-45). This opinion is a check-box form, where Dr. Acosta noted his assessment relates to the period of December 2009 until August of 2012. (R. 432). On the first page of the PRT, Dr. Acosta marked that the medical disposition was based on the following Listings: Listing 12.03, 12.04, and 12.06. *Id.* However, throughout the PRT, Dr. Acosta marked that Claimant's impairments meet the elements of Listings 12.03, 12.04, 12.06, and 12.08. (R. 434-39). Dr. Acosta also marked that he evaluated Listing 12.09 (Substance Addiction Disorder) in conjunction with Listings 12.04 and 12.06. (R. 440). Dr. Acosta marked that Claimant had mild restrictions in her activities of daily living, marked difficulties in maintaining social functioning and concentration, persistence, or pace, and had experienced three episodes of decompensation, each of extended duration. (R. 442). Finally, Dr. Acosta indicated that the paragraph C criteria were present. (R. 443).

The ALJ discussed Dr. Acosta's PRT, stating that the PRT

> is not consistent with [Dr. Acosta's] own objective exam findings, as well as with the overall evidence, which reflects less than marked limitation. The claimant has cared for her children, helped care for her grandparents, regularly attend church, drive, and complete college courses, all during the period she alleges disability, and these activities do not support marked limitation in any functional area. Therefore, the undersigned also accorded limited weight to [Dr. Acosta's] opinion[.]

(R. 18).

Here, substantial evidence supports the ALJ's decision to afford limited weight to Dr.

Acosta's opinion as reflected in the August 17, 2012 PRT. As an initial matter, the PRT is a form report without any narrative explanation, and is "entitled to little weight in the adjudicative process." *Whitehead*, 2011 WL 2036694, at \*9-10; (R. 432-45). In fact, Dr. Acosta's marks indicate internal inconsistencies throughout the PRT, and there are instances where narrative explanation is required but left blank, lending further support to the ALJ's decision to discount the opinion. *See* (R. 434) (regarding Listing 12.03, Dr. Acosta indicates the presence of "[p]sychotic features and deterioration that are persistent . . . as evidenced by at least one of the following:" but does not mark any of the four following choices, and also marks under the same listing that "[a] medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above"); (R. 442) (Dr. Acosta fails to specify the listings for which the identified Paragraph B criteria apply); (R. 443-44) (regarding the Paragraph C criteria for Listing 12.06, Dr. Acosta marks that Claimant has "[c]omplete inability to function independently outside the area of one's home," while also indicating "[e]vidence does not establish the presence of the 'C' criterion" and "[i]nsufficient evidence to establish the presence of the 'C' criterion (explain in Part IV, Consultant's Notes)" but does not fill in any narrative explanation in the section for "Consultant's Notes").

Further, the ALJ properly did not afford controlling weight to Dr. Acosta's opinion where it was contradicted by persuasive evidence of record. *Craig*, 76 F.3d at 590; *Hunter*, 993 F.2d at 35; *Mastro*, 270 F.3d at 178. The ALJ noted that Dr. Acosta's opinion was not consistent with his own objective exam findings and the overall evidence, (R. 18), which is supported by Dr. Acosta's treatment notes contained in the record. *See* (R. 274) (March 2, 2010 treatment note where Claimant reports that she is feeling good and planning to return to school); (R. 249) (December 3, 2010 treatment note where Claimant states she is feeling better and her mood is better on increased

19

medication); (R. 353) (May 5, 2011 treatment note where Claimant describes feeling and functioning "fair to good" with her mood being a seven out of ten where ten is the highest score); (R. 367) (September 2, 2011 treatment note where Claimant describes feeling good and "has been going to church and feels it [sic] working for her"); (R. 461) (February 10, 2012 treatment note where Claimant reports that her mood is better and she has been reading her Bible, and rates her mood as a seven out of ten); (R. 463) (March 21, 2012 treatment note where Claimant reports feeling "good using spiritual coping").

Dr. Acosta also determined that Claimant's activities during the time period she alleges disability were inconsistent with marked limitation in any functional area. (R. 18). The record evidence supports the ALJ's conclusion that during the time period at issue, Claimant was caring for her children and grandparents (R. 300, 305, 422, 508, 555), attending church (R. 268-69, 284, 567), driving (R. 300, 310), and completing college courses (R. 263, 284, 316, 337, 454). Additionally, Claimant performed at her church during this time (R. 318), recorded a demo album (R. 269), sold cosmetics part time (R. 301, 342), worked a part-time job at the community college (R. 307) and visited family in New Jersey with one of her sons (R. 313). The ALJ is not required to explicitly discuss all of the factors laid out in 20 C.F.R. § 404.1527(c)(2). *Ware*, 2012 WL 6645000, at \*2. Here, the ALJ properly considered the consistency and supportability of Dr. Acosta's opinion and substantial evidence supports the ALJ's determination that the opinion was entitled to limited weight.

## 2. Claimant's GAF Scores

Claimant also takes issue with the ALJ's evaluation of Claimant's GAF scores in the discussion of Dr. Acosta's opinion. Pl.'s Mem. [DE-25] at 26-27. "The GAF scale is a method of

20

considering psychological, social, and occupational function on a hypothetical continuum of mental health. The scale ranges from 0 to 100, with serious impairment in functioning at a score below 50." *Taylor v. Colvin*, No. 5:12-CV-779-FL, 2014 WL 1233042, at \*2 n.2 (E.D.N.C. Mar. 25, 2014) (unpublished) (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed. 2002) ("DSM-IV")). The Social Security Administration has been clear that GAF scores do not "have a direct correlation to the severity requirements in [the social security] mental disorders listings." *Wiggins v. Astrue*, No. 5:11-CV-85-FL, 2012 WL 1016096, at \*8 (E.D.N.C. Feb. 2, 2012) (unpublished) (citations and internal quotation marks omitted), *adopted by* 2012 WL 1016055 (E.D.N.C. Mar. 22, 2012); *see also* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000) ("The GAF scale, which is described in the DSM-III-R (and the DSM-IV), is the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association. It does not have a direct correlation to the severity requirements in our mental disorders listings."). Additionally, the GAF scale was dropped from the DSM-V due, in part, to its "conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) . . . ." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 16 (5th ed. 2013). Even so, the ALJ must consider a claimant's GAF score along with all of the record evidence. *Atkinson v. Astrue*, No. 5:10-CV-298-FL, 2011 WL 3664346, at \*11 (E.D.N.C. July 20, 2011) (unpublished) (quotations omitted), *adopted by* 2011 WL 3664858 (E.D.N.C. Aug. 18, 2011).

Here, the ALJ discussed Claimant's GAF scores along with Dr. Acosta's opinion, stating that he "accorded limited weight to the low [GAF] scores shown throughout the claimant's mental health treatment records that were assessed by Dr. Acosta, as well as by her other treating providers." (R.

21

18 (citing Exs. 10F, 11F, 12F, 13F)). Further, "Dr. Acosta, as well as other providers, consistently reported GAF scores of 50, which typically denotes serious mental limitations in overall functioning. For the same reason, the undersigned also accorded little weight to the GAF score of 45 that was assessed upon discharge after the claimant's hospitalization in November 2010." *Id.* (citing Ex. 1F). After discussing how Dr. Acosta's opinion as stated in the August 2012 PRT was not consistent with Dr. Acosta's exam findings and the overall evidence which reflects less than marked limitation, the ALJ stated that he afforded limited weight to both Dr. Acosta's opinion and Claimant's GAF scores, "which represent a snapshot of the claimant's overall functioning, as opposed to a longitudinal perspective." (R. 18-19).

As discussed above, substantial evidence supports the ALJ's determination to afford limited weight to Dr. Acosta's opinion, as Dr. Acosta's treatment notes and other record evidence do not support the serious limitations laid out in his opinion. The ALJ stated that he afforded limited weight to Claimant's GAF scores for the same reasons, and also because the GAF scores "represent a snapshot of the claimant's overall functioning, as opposed to a longitudinal perspective." (R. 18-19). Here, the ALJ discussed Claimant's GAF scores and substantial evidence supports his stated reasoning for affording the scores limited weight, even though he did not explicitly discuss every GAF score in the record. *See Wiggins v. Astrue*, 2012 WL 1016096, at *8 (concluding that the ALJ properly evaluated a claimant's mental impairments, even though the ALJ did not explicitly mention each individual GAF score in the record). The ALJ is not required to discuss every piece of evidence, and the ALJ's discussion of Claimant's mental impairments and the opinion evidence (including Claimant's GAF scores) is sufficient for the court to understand and meaningfully review the Commissioner's decision. *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861,865 (4th Cir. 2014)

22

(citations omitted). Accordingly, Claimant's argument on this issue is without merit.

## C. The ALJ Did Not Err in the Credibility and RFC Determinations

Claimant contends that the ALJ erred in determining that Claimant has the RFC to perform a full range of work, specifically citing to the limitations identified by Dr. Acosta in the August 2012 PRT and Claimant's own testimony. Pl.'s Mem. [DE-25] at 23-24. The Commissioner argues that substantial evidence supports the ALJ's RFC finding. Def.'s Mem. [DE-38] at 8-9, 12-16.

An individual's RFC is the capacity an individual possesses despite the limitations caused by physical or mental impairments. 20 C.F.R. § 404.1545(a)(1); *see also* S.S.R. 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC is based on all relevant medical and other evidence in the record and may include a claimant's own description of limitations arising from alleged symptoms. 20 C.F.R. § 404.1545(a)(3); *see also* S.S.R. 96-8p, 1996 WL 374184, at *5. Where a claimant has numerous impairments, including non-severe impairments, the ALJ must consider their cumulative effect in making a disability determination. 42 U.S.C. § 423(d)(2)(B); *see Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) ("[I]n determining whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments.") (citations omitted). The ALJ has sufficiently considered the combined effects of a claimant's impairments when each is separately discussed by the ALJ and the ALJ also discusses a claimant's complaints and activities. *Baldwin v. Barnhart*, 444 F. Supp. 2d 457, 465 (E.D.N.C. 2005) (citations omitted). The RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." S.S.R. 96-8p, 1996 WL 374184, at *7.

Here, the ALJ determined that Claimant had the RFC to perform

23

a full range of work at all exertional levels, but with the following non-exertional limitations: she is capable of performing simple, routine, repetitive tasks, and maintaining concentration, persistence, and pace to remain on task for period of two hours at a time throughout an eight hour work day in order to perform such tasks. She requires a low stress work setting, which is defined [sic] no production pace work, rather a goal-oriented job that primarily deals with things as opposed to people. In addition, the work must be stable, i.e. it must not involve more than occasional changes; no more than occasional decision making. She could have occasional interaction with supervisors or co-workers, but no more than incidental contact with the public, which means that she must be not be required to work directly with the public as a component of her work, such as sales or negotiation.

(R. 15-16). In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 16-18).

The ALJ appropriately exercised his discretion in discounting Claimant's testimony regarding the severity of her limitations. *Id.* When assessing a claimant's RFC, it is within the province of the ALJ to determine a claimant's credibility. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984) ("Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight.") (citation omitted). Federal regulation 20 C.F.R. § 404.1529(a) provides the authoritative standard for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig*, 76 F.3d at 593-94. First, the ALJ must objectively determine whether the claimant has medically documented impairments that could cause his or her alleged symptoms. S.S.R. 96-7p, 1996 WL 374186, at \*2 (July 2, 1996); *Hines v. Barnhart*, 453 F.3d 559, 564 (4th Cir. 2006). If the ALJ makes this first determination, he must then evaluate "the intensity and persistence of the claimant's pain[,] and the extent to which it affects her ability to work," *Craig*, 76 F.3d at 595, and whether the claimant's statements are supported by the objective medical record. S.S.R. 96-7p, 1996 WL

24

374186, at \*2; *Hines*, 453 F.3d at 564-65. Objective medical evidence may not capture the full extent of a claimant's symptoms, so where the objective medical evidence and subjective complaints are at odds, the ALJ should consider all factors "concerning the individual's functional limitations and restrictions due to pain and other symptoms." S.S.R. 96-7p, 1996 WL 374186, at \*3 (showing the complete list of factors). The ALJ may not discredit a claimant solely because his or her subjective complaints are not supported by objective medical evidence. *See Craig*, 76 F.3d at 595-96. But neither is the ALJ required to accept the claimant's statements at face value; rather, the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." S.S.R. 96-7p, 1996 WL 374186, at \*2; *see also Taylor v. Astrue*, No. 5:10-CV-263-FL, 2011 WL 1599679, at \*4-8 (E.D.N.C. Mar. 23, 2011) (unpublished) (finding the ALJ properly considered the entire case record to determine that claimant's subjective complaints of pain were not entirely credible), *adopted by* 2011 WL 1599667 (E.D.N.C. Apr. 26, 2011).

In the instant case, Claimant first cites to the August 2012 opinion of Dr. Acosta, as reflected in the PRT, to discredit the ALJ's RFC determination. Pl.'s Mem. [DE-25] at 23-24. As discussed above, substantial evidence supports the ALJ's decision to discredit Dr. Acosta's opinion, and Claimant may not point to this opinion to undermine the ALJ's RFC determination where the ALJ properly afforded the opinion limited weight. Further, Claimant cites to her testimony at the hearing, which she argues "shows that she is unable to work due to depression, anxiety, paranoid thoughts, lack of motivation concentration difficulties, recurrent fatigue, crying spells, auditory hallucinations, and difficulty focusing." Pl.'s Mem. [DE-25] at 24 (citing R. 28-49). Claimant also highlights her mother's testimony that Claimant "is no longer the person she once was, is unable to socialize as she had before, and is unable to finish tasks at home." *Id.* (citing R. 50-56). The ALJ considered the

testimony of both Claimant and her mother, but found the extreme limitations described were not supported by the record. (R. 16-18). Specifically, in finding Claimant not fully credible, the ALJ stated:

> [t]he above-described psychiatric evidence reflects that the claimant was briefly hospitalized within the period in question due to psychiatric symptoms, but she did not require any additional hospitalizations. Additionally, the evidence shows that, even though she has continued to experience symptoms, her providers have mostly noted normal objective findings. The notes reflect she has generally responded well to mental health treatment, which has also been supported by the fact that she has consistently been able to care for her children and grandparents, as well as complete college courses. Again, she has also consistently reported an interest in returning to work, and that she was actually occasionally searching for jobs.

(R. 18). Substantial evidence in the record supports the ALJ's determination that Claimant's testimony regarding her limitations was not fully credible. As discussed above, during the time period at issue, Claimant was responding well to her mental health treatment (R. 249, 274, 353, 367, 461, 463), caring for her children and grandparents (R. 300, 305, 422, 508, 555), completing college courses (R. 263, 284, 316, 337, 454), and working part-time jobs (R. 301, 307, 342). It is insufficient for the Claimant to point to other record evidence and argue that the ALJ's decision is unfounded, *Frazier v. Astrue*, No. 4:06-CV-254-FL, 2008 WL 138050, at *14 (Jan. 10, 2008) (unpublished), as this invites the court to re-weigh the evidence and substitute its own conclusions for those of the Commissioner, *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Here, substantial evidence supports the ALJ's analysis of Claimant's credibility and the resulting RFC determination, and Claimant's argument on this issue is without merit.

**D.    The ALJ Did Not Err in Failing to Evaluate Claimant's Disability Determination by the North Carolina Department of Health and Human Services**

Claimant contends that the ALJ erred by failing to consider Claimant's disability

26

determination by NC DHHS. Pl.'s Mem. [DE-25] at 27. The Commissioner responds that the ALJ properly reviewed the evidence of record and the record does not contain an actual disability determination by NC DHHS. Def.'s Mem. [DE-28] at 17-18.

At the hearing, Claimant indicated that Medicaid pays for her prescription medications. (R. 40) ("I've talked to Dr. Acosta about maybe increasing my medicine, and he said Medicaid may give me a hard time about it, so we haven't discussed it any further."). Additionally, several of Claimant's treatment notes bear the following label: "Funding Source #:/ Medicaid." (R. 260, 264-65, 268-69, 271-73, 403). Some of Claimant's treatment notes also include a Medicaid number. (R. 453, 550-55, 557-63, 565, 571). The psychiatrist who performed a consultative examination for Disability Determination Services references Claimant's Medicaid status as well. (R. 328) ("[Claimant] is on Medicaid I believe").

20 C.F.R. § 404.1504 provides that a disability determination made by another governmental or non-governmental agency is not binding on the Commissioner. Even so, "evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered." S.S.R. 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006), *see also* 20 C.F.R. § 404.1512(b)(v). Here, the Commissioner correctly points out that the record does not contain a disability determination by NC DHHS. Def.'s Mem. [DE-38] at 17-18. When a claimant is represented by counsel, the ALJ is "allowed to presume that [Claimant] presented his best case." *Schaller v. Colvin*, No. 5:13-CV-334-D, 2014 WL 4537184, at *9 (E.D.N.C. Sept. 11, 2014) (unpublished); *see also Aytch v. Astrue*, 686 F. Supp. 2d 590, 599 (E.D.N.C. 2010) ("[W]hen an applicant for social security benefits is represented by counsel the [ALJ] is entitled to assume that the applicant is making his strongest case for benefits.") (quoting *Johnson v. Chater*, 969 F. Supp.

27

493, 509 (N.D. Ill. 1997)). In the instant case, "Claimant has not included in the record for consideration any evidence indicating what benefits Claimant received, the period during which [s]he received benefits or the basis for the benefits received." *Wright v. Astrue*, No. 5:09-CV-546-FL, 2010 WL 5056020, at * 4 (E.D.N.C. Sept. 16, 2010) (unpublished), *adopted by* 2010 WL 5055899 (E.D.N.C. Dec. 6, 2010). "As there is no documentation in the record providing the basis for any compensation Claimant received, there was nothing for the ALJ to consider . . . [i]ndeed, remanding this matter will not resolve this issue given there is no evidence of a disability benefits decision in the case record." *Id.* (citations omitted). Accordingly, as the record does not contain any disability determination by another agency, Claimant's argument on this issue is without merit.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-24] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-37] be ALLOWED and the final decision of the Commissioner be UPHELD.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **August 11, 2015** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C. Any response to objections shall be filed by within **14 days** of the filing of the

objections.

If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).

Submitted, this the 25 day of July, 2015.

Robert B. Jones, Jr.
United States Magistrate Judge

29